The first case of the afternoon, People v. Chestnut, for the appellant, Ms. Brooks, for the athlete, Mr. Lehman. Ms. Brooks. Good afternoon, your honors. May it please the court and counsel, my name is Anastasia Brooks, and I represent the appellant, the people of the state of Illinois. This case is a fairly simple one, dealing with the instance in which a defendant came into a house where the search was ongoing, and was detained there, and the state does not challenge the trial court's finding that he had been detained and was not free to leave when he entered the porch area, in which he was asked three questions about why he was there, and whether he had drugs on him, and whether he would consent to a search, which he did consent, and the defendant successfully prevailed on the trial court on the grounds that the search was invalid because the detention was unlawful at that point, and also because of a Miranda violation. The state urges this court to disagree with both of those grounds, as well as find that a few of the facts that were found by the trial court were against the manifest way of the evidence. And that type of showing is actually a difficult one to make, but it is possible to make on the straightforward record that exists in this case, where there was very little facts in dispute, but for whatever reason, the trial court deemed that the officers had never asked anything about why the defendant was there, even though an officer quite clearly testified that he had done so, and that the trial court believed that he was only questioned about drugs, which is not true because he was asked about why he was there, which I think the defendant agrees is a permissible subject of questioning under the circumstances where he is being detained due to an ongoing search warrant that is being executed. Also, the trial court, and also the defendant, makes the argument in this brief that he had been repeatedly asked for a consent search, whereas there is no such reference to that testimony or fact in the record, and no citation made in the defendant's brief to any such fact. So the trial court's belief that he had been repeatedly requested for consent is against the manifest way of the evidence. Does it make a difference what the search warrant was for? I mean, if we mention the word drugs, does that then mean that the postman is suspect? Because he might be bringing a package that's being delivered with drugs in it, the LP guy, the Culligan water man, the past the neighbor, who goes and rings the doorbell because they want to get two eggs. Of course, they might say, that's all I want is two eggs, but the police might not believe them. I mean, you can have a search warrant for a lot of different reasons. Why does somebody coming to the door make a difference? Well, the relevance may be in the sense that the defendant may claim that the police exceeded the permissible scope of Michigan v. Summers, which the scope of Michigan v. Summers, the authority to detain persists so long for the officers to ascertain the defendant's complicity, if any, or, as Summers said, to ensure his uninvolvement in criminal activity. So, the type of criminal activity being investigated under the search warrant may be relevant to what the officers can do to investigate the defendant's complicity or involvement in criminal activity of a similar sort. Here, his possession of drugs, he wasn't questioning about any other sorts of crimes that he may have been committing or have committed. So, it wasn't an open-ended... So, if it's a crack house, what are you asking about? Do you have any weed on you? Would that exceed the scope? That would be a closer question, although I would not necessarily agree with an argument that that would exceed the scope, because those are still illicit because it was a drug investigation, according to the record, and the defendant was questioned only about drug possession. So, when he... The fact that he arrives only inside the porch, and the state cites the Seventh Circuit Court of Appeals' recent decision in Jennings, where, in fact, there, the defendant had only made it to a parking lot next to the apartment, which was still inside their security perimeter. Here, inside an enclosed porch, with a secure outside door. So, he's made it inside the security perimeter. There's a uniformed officer outside the door to the rest of the house, what he considered the house itself. What if the uniformed officer was outside the door to the porch, and Mr. Chestnut comes meandering up, and the officer says, I'm sorry, you can't come in here, we're doing a search. At that point in time, would anybody have probable cause to search Mr. Chestnut, or ask him any questions? Well, the question may be, the authority to detain him in Michigan DeSommers, because of him breaching the security perimeter. Well, he was up to the security perimeter, and then the officer says, I'm sorry, we're doing a search here, we're pursuant to a warrant, you can't come in. And Mr. Chestnut, assuming he's normal, would say, alright, and leave, but instead of before he got to leave, the officer says, well, while you're here, I've got some questions for you, why are you coming into this house, do you mind if I search your person, and so on and so forth. Would that have passed muster? Well, practically, he probably would have turned around before he, when he saw the police, but essentially, that's a closer question, it's not presented here. I ask the question because the plainclothes officer basically met him at the door, opened the door for him to walk into. He rings the doorbell, the plainclothes leaves, leaves the door open, and then heads halfway down the sidewalk. Opens the door for him, as though you're welcome to go in, and then he goes down the sidewalk, and this is how the stop is initiated at that point. But my point is that a police officer opened the door to admit him to the residence, not saying anything about, well, there's a search going on, you can't come in. It's like, come on in, and that come on in then turns out to be the basis for a Terry stop, and it turns out to be the basis for a search, and it turns out to be the basis for questioning pursuant to a Terry stop. Right, but the defendant voluntarily entered, he was wanting to get inside. He rang the doorbell, which is at least an intent to draw somebody to the door to transact business, but the fact is, without being instructed verbally to enter, he, on his own motion, enters the porch area. Do you suppose the undercover officer might have thought, aha, fly to the honeypot? It's possible that this could have been a tactic of the police, but that's not to be disclosed in the record whether that was in fact the case, because they would have the authority to detain him once he enters the porch, and the exact location of the security perimeter in this case is not fully articulated. I mean, the police didn't say, yes, we were, you know, our security perimeter is at the sidewalk or something like in Jennings where it was in the parking lot. We might presume, though, it's the front porch, which is part of the house, especially since it's an enclosed porch, right? A fully enclosed porch is considered part of the house, so whether for Fourth Amendment purposes or for an arrest without a warrant, whether anyone, you know, where does it reach the threshold for Fourth Amendment purposes, that's a separate question, not really an issue here, because the defendant never made it actually inside the house itself. So, the trial court, the state perspective suggests the trial court erroneously construed the requirements and the scope of Michigan v. Summers and the authority to detain by holding the officer only to the questions of identifying the defendant and asking him why he was there, and so, therefore, because the authority to detain should persist until the officer can ascertain whether he is uninvolved. And the defendant's argument here, and it appears the only argument he really has against this issue, is that the scope of this was exceeded because the questions about drugs and the request for consents are not applicable to the test itself, which is his complicity for a possible drug violation, which doesn't really make sense because how else can the police officers investigate whether this defendant is involved in drug dealing or drug possession without asking him if he has drugs and requesting if he would consent to be searched for drugs. So, therefore, this fits squarely within the scope of that exception and, therefore, the consent was given while he was being lawfully detained pursuant to Michigan v. Summers as interpreted by the Seventh Circuit in Jennings. The next question also is, and this may be necessary to reach if the first argument fails, which is whether he was being detained upon reasonable suspicion. And the people request this court to review the finding of no reasonable suspicion made by the trial court to review that question de novo. And here there were suspicious things that the defendant did. Now, I know the trial court didn't agree with the question on invitation, and the state's not directly disputing that question. However, the fact that he was invited inside, and I put a quote around the invitation, because that was subject to dispute in the trial court based on the officer's testimony saying he was not actually invited inside. But I can see how from the defendant's perspective it would appear so. Somebody opens the door and lets him in after he rings the doorbell. However, he was only admitted by a stranger, an undercover officer who presumably the defendant did not know. So the fact is that an officer, as part of this experience, could infer that the defendant was entering as part of a pattern of drug activity which may have existed at the residence. Because he was admitted by a stranger and apparently walked in without any question or concern about who this person was that was admitting him into this house. Also, the other thing was his nervousness. So he's asked sort of like a dual question by the officer, why are you here and do you have any drugs? And at that point the defendant exhibits nervousness by removing his coat. They experience the police again, and this was actually testified to, says that in their experience subjects kind of do this when they're preparing to flee. So that's something that the trial court can also, should have taken into account. And this distinguishes it from the Elliott case where it's not just mere presence at the suspected drug house, but we have the actual nervousness which is a totally distinguishing factor from Elliott. And then also the question, if this is in fact a proper Terry stop up to this point, at what point is this unreasonably prolonged? So therefore it takes it out of the scope of Terry. And that becomes a defendant's burden to show that there was an unreasonably prolonged seizure. No longer a scope inquiry in terms of what questions are being asked under the recent developments in the law. But here he has to show prolonged detention in time. And there is no evidence in the record to show that this was anything other but a very, very brief interaction between this defendant and the two officers. And the defendant never also made any evidence that he had provided a satisfactory account of his presence inside the house when being questioned by the police regarding why he was there. So therefore there's no showing that any reasonable suspicion that may have existed would have dissipated by the time the officer requested his consent for a search. And so I moved on to the final issue which is the application, which is actually a novel application of Miranda to circumstances of what would be either a brief detention under Summers or a brief detention under Terry. Because here there's no showing of any sort of formal arrest or similar, or restraint to a similar degree. So there's no use of handcuffs and the defendant's only argument is that he felt like he was effectively surrounded by two officers. And how did he be surrounded by two officers? Well, of course you have one in the front and one in the back. So although he's not free to leave, this is an approached formal arrest. He's not handcuffed. So the fact is also it's general honesty and questioning which is an exception to Miranda. And Miranda is the prophylactic rule which has never been extended beyond the concerns which gave rise to its rules. So therefore in this circumstance also the final reason is that the granting of consent is not testimonial, it's not communicative, it's not covered by the Fifth Amendment privilege. So therefore there's no reason to suppress that part of the defendant's statement. Yes, you can search me. At least the non-verbal agreement or verbal agreement, whichever was the case. So for those reasons the state requests this court to reverse the order of suppressing evidence, quashing arrests, and remand for further proceedings. And I'm willing to take any questions. If not, I'll be back for rebuttal. Thank you, Your Honors. Thank you. Counsel. Thank you, Your Honors. May it please the court, counsel. The most important thing here is to start with the findings of fact. The initial finding of fact by the court is that the court found that when Officer Watson's testimony is taken in its entirety, it is clear that Officer Watson created the appearance that he was letting the defendant in. That's important because by Officer Watson's own testimony, defendant was under suspicion of criminal activity because he had walked into the residence where police were conducting an investigation. He also put it another way. Defendant walked right into an alleged drug house without being invited in as if to know the resident or the drug activity. Now this finding of the court has to pass against the manifest way to the evidence analysis. In other words, that's a pretty high bar. We have to be able to say that no reasonable person could possibly arrive at the conclusion that the court arrived at. Now, if you take the court's finding of fact that this was a situation created by Officer Watson, then the basis for his reasonable suspicion goes away. And there is no reasonable suspicion for a terrorist act. That's supported by cases like Elliot, in which the woman in Elliot was actually in the house, in the bathroom, and the court said that the mere presence in the apartment during execution of a search warrant did not justify investigation. Similarly, in a barra, when they're in a bar, the court determined that the defendant's mere presence in a bar while a search warrant was being executed was an insufficient basis for an investigatory stop. Now, even if the court were to strike that, the next step is the state tries to argue that Elliot, in which the woman was found in the apartment, has no mention of nervous behavior on the part of the defendant. I would point out that the timing of events is critical here. First, Officer Watson testified that they were going to, the way he put it is, we were going to find out who he was and why he was here. There's no evidence that he asked actually what his name was, who he was. What we can make of that, I don't know. There was testimony that he asked why he was there. There was no testimony whatsoever that the police officers were dissatisfied with the responses that he gave to those questions. Then they asked him about whether he had drugs. Well, they've now already gone beyond the scope of the Terry stop. If they were indeed not dissatisfied with his answers, then detention should have ended there, at least under Terry. Only after they exceeded the scope by asking him whether he had drugs on him, and repeatedly, twice, twice they asked, one officer then the other asked, may we search you? He could have said no though, couldn't he have? What would have happened if he said no? If he said no, then by oral rights, then there would not have been a search. However, however, as is articulated under, well, any consent that exceeds the scope of either Terry or Summers would be tainted and therefore should be thrown out anyway. In other words, the second piece of the analysis is whether or not, whether or not the consent was valid. The consent was requested only after the questions regarding identity, if it was indeed asked, and why he was there, which the officers indeed had no, there was no testimony that it objected to that, his responses. They exceeded the scope into asking why there was drugs, whether or not they could search him, and therefore any consent that he gave was tainted and should not be considered, should be thrown out. With respect to Summers, and Terry for that matter, the issue of whether the scope of the detention was exceeded is really a two-part analysis. Number one is the conduct of the officers themselves. The second is the duration and length of time. There's nothing that I could find that indicated that one or the other of those took precedent. The state indicated that there was no testimony that there was, that the duration was such that in and of itself it would exceed the scope. And I'm not arguing that. Indeed, I would argue that under Summers, technically, I believe that they could have probably kept him there unharassed until the end of the search, and then let him go. I think there's certainly precedent for that. So scope in those terms, scope in those terms, I don't think the duration doesn't apply. It's the conduct. And again, the scope as far as conduct concerns, who he is, why he's there. And as I wish to reiterate, there's no evidence of objection to those answers. No evidence that anything that he said in response to those gave rise to anything further. And the nervous activity, the nervous conduct that Officer Wasson described took place after the scope had been reached in terms of the questioning under Terry and Summers. So am I understanding you correctly? You think they could have detained him until the search was completed and they could have done that lawfully, but their mistake was asking him whether he had any drugs in his possession and whether they could search him. Exactly, exactly. The scope of the interrogation. Now, with respect to the issue of whether Mr. Chestnut was seized, well, number one, the trial court found that when taking into account all circumstances surrounding the incident, the conduct of the police would leave a reasonable, innocent person under identical circumstances to believe that he or she was not free to decline the officer's requests or otherwise terminate the encounter. Moreover, the state expressly declined to challenge the trial court's factual finding that the defendant was, and this is the word that was used in that stipulation, seized by the police upon entering the enclosed porch. And with respect to the issue of whether Miranda warnings should have been given, it is the case that in general, this is not an absolute, in general, Miranda has the tendency to apply in the context of a custodial seizure in the context of a police station. But it's certainly not always the case. In this particular instance, once they exceeded the scope of the Terry stop and the summer investigation, he's seized, he's been subject to additional interrogation that goes beyond the scope of Terry and Summers and therefore was entitled to be advised of his rights. Now, with respect to what are the consequences of a lack of Miranda warnings, well, unfortunately for us, there is certainly the case law that indicates that giving a consent to search is not testimonial and therefore not subject to the Miranda considerations. However, if the court buys what I'm saying about where that draw the line on that scope, namely that the scope ended once they showed no dissatisfaction with his response to questions as to identity and what he's doing there, then the questions about the drugs certainly come under Miranda. It's calculated to get testimony from him that could be self-incriminating. And indeed, it was only after the question regarding whether he had drugs or not that Officer Watson begins to articulate that this guy is acting nervous. Okay? So, we've already gotten into the violation of Miranda there. The only nervous behavior that's described or that's mentioned as nervous behavior is the unzipping of the coat? Well, to be fair, he says that he's looking around and he's unzipping his coat. He explains that in his experience, people sometimes will unzip their coat to take it off to make it easier to flee. Well, he's surrounded by two police officers. There was a question by the state as to whether, how can you possibly be surrounded by two officers? Well, in Gurna, which incidentally involves the same Troy Watson, he has two cops on bicycles surrounding an SUV. Well, technically, I suppose somebody could have punched the gas and got out of there away from being surrounded by two officers, but that's not what the court found. The court found that they were reasonably detained in Gurna. It seems that Officer Watson hasn't completely learned what the scope of his investigatory stops is because he's essentially done the same thing here. Moreover, he actually did the same thing in People v. Miles, another 4th District case in 2003, 343 Illap 3rd 1026. He wasn't the actual initial stopping officer. That was another officer. It was a traffic stop in which there was a lot of questions about whether or not... The stopping officer changed her story a couple of times. At one point, she was saying that the registration light was out. Later on, she said that she stopped them because the passenger wasn't wearing a seat belt. It turned out that when they stopped the car, both the passenger and the driver got out. They were ordered back in. Then she came in and saw, oh, you haven't got a seat belt. But, you know, Watson was involved in that same stop. Do I understand you to say that they must not have been dissatisfied with his answers or we would, I guess inferentially, we'd hear what the dissatisfaction was? Yes, I think that has to be the case. Well, what were the answers? There's no testimony. They don't testify. They don't testify. And I think under Royer v. Florida, it is the burden of the state to prove that they did not exceed the scope there. If they wanted to elicit testimony from Officer Watson to the extent were you satisfied with those answers, they could easily have done so. That was the state's burden. And in this particular instance, it would have been some dissatisfaction with the answers to those questions that would have been within the scope of Terry and Summers that could potentially have given rise to further articulable suspicions that might have been able to legally push back the scope of those stops. In this case, there's no such evidence that that's the case. In fact, the only conclusion that we can come to is that they were perfectly satisfied. They just wanted more information and they didn't really care whether it was in the scope of Terry and Summers. The state mentioned in passing that, and there's really no evidence in any of the records to support this, that Warren was there to transact business. It kind of slipped out and I don't know whether that was intentional or not, but there's nothing in the record that says that. Is there anything in the record that tells us what was obtained from the home when it was searched? I understand that's a separate case, but is there any comment on it at all? I really don't know the answer to that. I would be just guessing. It may indeed be somewhere in the record, but again, that would have to do with the search of the home. I don't particularly know what was seized from the tavern in Ibarra. I don't know particularly what was seized from the house in Elliott either, but I don't think that either of those things would have any specific bearing on the court's findings in this case today. I would also note that with respect to Terry, Terry also permits officers conducting an investigative stop to do a pat-down for their own protection. The record's clear that there was no pat-down. Officer Watson actually testifies kind of ambiguously here. He says, well, we didn't have a concern for weapons, but he could have had anything under his jacket. Well, take that in combination with the fact that they never even bothered to perform a pat-down. I think that, again, their index of suspicion regarding this individual's danger to them and to the search warrant effort, unlike a case in which there was Mueller v. Mena, 544 U.S. 93, where in that particular instance, it was kind of similar to this in some ways, but in that particular instance, the search warrant was for weapons and evidence of gang involvement, gang activity, so that under those circumstances, police could be reasonably concerned about people on the premises during the search warrant posing a real threat and danger to their safety. That doesn't apply here. At least there's no evidence in the record that would indicate that that's the case. They clearly had no concern about safety, their safety. Finally, all of my arguments with respect to the Terry investigative stop, I think, really, we don't even get there. The reason is, is because the articulable suspicion for the Terry stop, pursuant to the findings of the court, were created by the officer. The officer testified that they watched him through the curtained window, come up, approach the house, come up the walkway, and ring the doorbell. And immediately in response, he opened up the door. Actually, he says that he walked halfway down the sidewalk at one point. But at another point, what he does actually say is, I went a few feet behind him, turned and watched as he entered inside the residence. But he didn't say anything to the defendant. He didn't say, come on in, join the party, or we're doing a search here. He walked by him. And the defendant walked up the steps and into the house. I understand. And indeed, however, we have to go back to what the standard for against the manifest weight of the evidence is. That requires that you come to the conclusion that no reasonable person could come to the conclusion that the court came to. And the court's conclusion was, Officer Watson's testimony, when it's taken in its entirety, it is clear that he created the appearance that he was letting the defendant in. And that is tantamount to an invitation. In other words, the articulable suspicion, which would have been the basis for the Terry stop, was created by Officer Watson. Now, again, with respect to the length of his detention, I don't really think that's relevant here. Sure, as the state indicated, all of this took place in what appears to be a relatively short time. But within that time, he was arrested. By the time they searched his jacket unlawfully, they had found something. By that time, he was arrested. So we really don't know how long he would have been detained had they not requested the search. And under Summers, I think it's pretty clear that I suspect that it might really depend on the facts of the case, the sensitivity of the activities of the officer. There simply isn't enough information in the record to tell us exactly what the permissible duration of a summer stop would be, the summer detention would be. I can imagine fact scenarios in which, let's say, somebody is searching a crack house, or if there was some index of evidence that perhaps the guy, if they let him go, he would go and warn somebody else. You could see where such a situation might arise where they'd want to keep him, just keep him there until they'd finished their business, but unharassed by questions that exceed the scope permissible by law under Summers. Well, in truth, had they kept him for just a while, if he really was exhibiting signs of nervousness, and they said, you need to stay here on the porch until we finish searching the six-room house, I have a feeling that he would have acted in such a way that they could have constructed articulable suspicion. Quite possibly. He probably would have gotten more nervous. Quite possibly. Since, as it turned out, he was there for a nefarious purpose, apparently. Well, it was Holden. Yes, yes, that is the bottom line. He was Holden, but as to whether he was there for a nefarious purpose, we don't know. I thought he said something like, I was there to... I guess he just says something like, I was getting high. He starts to answer it as if I was there to either deliver or pick something up, but that doesn't matter. But indeed, in the context of a Fourth Amendment analysis, the ends can't be used to justify the means. Agreed. So, I don't think I have any further argument on any of these points other than to urge the court to affirm the trial court's findings and their rulings of law, and to affirm the dismissal of the case. Thank you very much, Your Honors. Are there any further questions that anybody would like to pose to me? No. Thank you very much. Thank you. Ms. Brooks? Very briefly, Your Honors, just have a few quick points. Defense refers to the conduct under Summers with respect to the scope inquiry. And they also cite Mueller v. Mina, and I believe also Royer. It's kind of interesting, because in my brief, my reply is cited Harris, which talks about, in the context of police questioning, now the duration prong is only what's relevant. And also, Mueller v. Mina, I believe, was a case where there was a Summers detention. The defendant there was asked about her immigration status, I recall. And in that case, that was not a violative of Summers. They could do that. Note that they could physically search her. I don't think that was the case. But whether they could just ask her a question, like, here, do you have drugs, that's not going to violate the scope of Summers under the authority of Mueller v. Mina. And I also believe in Royer. I'm not sure one of those cases from the Supreme Court, like Royer, they refer to, I think, the request to consent was permissible. So here, it's like, the defendant refers to whether he's free to decline the encounter, terminate the encounter. But there are cases, and the defendant doesn't cite any opposite cases, that say where you can consent while you're being detained. So it's not like, okay, he's being detained, he's not free to leave, therefore, no consent is permissible. The question is that he's being unlawfully detained at the time he gives consent. And here, according to Lee Summers, and also the state's arguments with respect to Terry and reasonable suspicion, he was being lawfully detained when he grants consent here. So the officer's conduct was not objectionable, merely by asking questions and requesting consent to search. And also in reference to the same officer, Watson, being involved in the Gurna case, I believe this Court should refer to Officer Watson's conduct in the context of the facts of this case, and not judge it based on what he may have done elsewhere. And Gurna being distinguishable there, because I believe the purpose of that detention had concluded by the time the officers remained standing there, continued to detain the defendant. So in there, the continued detention was impermissible, which is unlike this case, where the purpose was not fulfilled until he was asked about drugs and given consent to search. So if I'm a trial court judge and I say, you invited a man and created the situation such that he's on the enclosed porch, you either didn't ask him about his identity and purpose, or if you did, inferentially, you must have been satisfied. And what you describe as suspicious activity, to me, is meaningless. Unzipping a coat and looking around. I'd look around, too, if a strange man let me onto the porch of a house that maybe I knew. I conclude from that, that that should have been the end of it. You shouldn't have asked any further questions. You had no reason to ask any further questions. Why am I wrong? Well, as I said in my brief, the case of R. Vizu, where it talks about how you don't have to rule out innocent conduct in order to have a reasonable suspicion. Also, you have to give due deference to the experience of the officers who make conclusions about certain conduct. And his experience unzipping the coat and looking around means something. Whether it could mean something else or not is not really important. But there's also language about if the suspicious, what you call a suspicious activity, could include such a huge group of people, most of whom might very well be innocent. You don't extrapolate from that, that that suspicious activity gives you reasonable suspicion. I mean, zipping or unzipping your coat or looking around, whether in the presence of a police officer or not in the presence of a police officer, is simply common behavior. Except as the defendant makes the point here cogently, that timing is very important. Well, at the point he's being asked, what about drugs? And now the defendant starts unzipping his coat and looking around. Only at the point drugs get interrupted in the conversation. That timing can be very important. So he gets nervous after they begin to ask drug questions. Why'd they ask the drug questions if the judge says, you brought him up onto the porch, you answered the doorbell and opened the door and let him in. And then apparently there was some conversation because Wasson testifies that he shook hands with whoever remained on the porch, I think. He shook hands and chatted. I thought that was the nice way to put it. They chatted, they had a chat on the front porch. They did introduce themselves. And then what happened? Why do I then begin to ask about drugs? Why at that point? Because he's entered into the porch drug investigation. Except that the judge has already found that the police set up the situation so that he would enter. Otherwise, he's just a mope walking by. Yeah, I know, he rings the doorbell. They could have met him at the door and said, you need to stay right here. What's your name? Joe Smith. Stand right there, don't move. We're doing a search warrant. Don't move. My time has expired. Did you want me to answer a particular question? Yeah, I did ask several. I know. I would like to try to, but... Pick one. Pick one to answer. Pick one to answer. Well, it's true that part of this scenario was constructed by the police by opening the door, giving the appearance of being invited in as the trial court found. I'm not challenging that particular thing, but I do want to emphasize, as I said, the important point is the manner of the invitation. It's just a stranger, he just opens the door, doesn't say anything, and I believe that is somewhat suspicious and is entitled to be considered by the officer. Thank you, Your Honor.